## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LORETTA A. BROWN,

      *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant*.

_____/

CASE NO. 15-10478

DISTRICT JUDGE ARTHUR J. TARNOW
MAGISTRATE JUDGE PATRICIA T. MORRIS

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 15)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Brown is not disabled. Accordingly, **IT IS RECOMMENDED** that Brown's Motion for Summary Judgment (Doc. 14) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 15) be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*. and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381–1385. (Doc. 3; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 15).

Plaintiff Loretta Brown was forty-five years old as of her date of alleged disability, September 20, 2005. (Tr. 303). This application was denied on December 15, 2011. (Tr. 249-50). Brown requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Frederick Michaud on October 30, 2012. (Tr. 242-48). A second hearing was held before the same ALJ on August 5, 2013, in which Brown, who was unrepresented by an attorney, testified, as did vocational expert ("VE") Pauline McEachin and psychological expert Robert McDevitt. (Tr. 198-225). On August 30, 2013, the ALJ issued a written decision in which he found Brown not disabled. (Tr. 182-193). On January 13, 2015, the Appeals Council denied review. (Tr. 1-4). Brown filed for judicial review of that final decision on January 17, 2014. (Doc. 1).

### B.   Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will

2

not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C.   Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.   The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Brown not disabled under the Act. (Tr. 193). The ALJ found at Step One that Brown had not engaged in substantial gainful activity following her alleged onset date of September 20, 2005. (Tr. 187). At Step Two, the ALJ concluded that Brown had the following severe impairments: "lumbar disc disease; obesity; status post elbow fracture with rod placement; depression versus bipolar disorder." (Tr. 188). At Step Three, the ALJ found that Brown's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 188-89). The ALJ then found

4

that Brown had the residual functional capacity ("RFC") to perform light work, except that Brown "is limited to the occasional use of her right (dominant) arm; she can perform unskilled, simple, repetitive work, and keep up with the demands of production." (Tr. 189-91). At Step Four, the ALJ noted that Brown could not perform any past relevant work. (Tr. 191). At Step Five, the ALJ found that a significant number of jobs exist which Brown could perform despite her limitations. (Tr. 193-93). As a result, the ALJ found Brown not disabled under the Act. (Tr. 193).

### E.   Administrative Record

#### 1.   Medical Evidence

Brown's voluminous medical transcripts begin with a September 8, 2005, discharge report prepared at Community Network Services. (Tr. 430). A social worker or psychiatrist rendered a GAF score of 45, but did not assign scores or answers to most of the form because of non-compliance and a lack of contact. (Tr. 430-31). Brown was homeless as of her discharge date. (Tr. 430).

On October 10, 2006, Brown underwent a consultative mental evaluation with Dr. Margaret Zerba. (Tr. 439-441). There, Brown asserted that she was unable to work because of arm pain, limited lifting ability, panic attacks, concentration issues, desire to self-isolate, and sleep issues. (Tr. 440). She was apparently no longer homeless as of this date. (*Id.*). Brown also asserted that she had friends but did not have hobbies. (*Id.*). She asserted that she could not lift over two pounds. (*Id.*). She described her typical day as centering around her panic attacks, which occurred several times per day, even when watching television, and which resulted in feelings of "losing all control," heart pounding, and pressure on the chest. (*Id.*). She performed

all household chores, and was apparently able to perform grooming and hygiene activities. (*Id*.). She arrived at the examination with a social worker from another facility. (*Id*.). Her insight and judgment were fair to poor, and her stream of mental activity was slow but well organized. (*Id*.). She had no suicidal ideation and no evidence of psychosis. (Tr. 441). Tests of her sensorium and mental capacity returned largely normal findings. (*Id*.). Dr. Zerba diagnosed bipolar disorder, generalized anxiety disorder with panic attacks, and assigned a GAF score of 50. (*Id*.).

Brown underwent another consultative evaluation on October 21, 2006, with D.O. Homan Mostafavi. (Tr. 443-45). D.O. Mostafavi noted that Brown suffered aftereffects of right elbow trauma, and was able to "go about most of her daily activities, however, it takes her longer to do so because of pain in her arm." (Tr. 443). She could walk and sit without difficulty, but could not stand for more than twenty minutes or lift more than two to five pounds with her right arm. (*Id*.). She had decreased range of motion in her right elbow, but did not suffer tenderness of any joint. (Tr. 444). Brown retained eighty percent of her grip strength in the right hand, and had full dexterity in her hands. (*Id*.). She had mild difficulty getting on and off the examination table, performing heel and toe walking, and squatting. (*Id*.).

On January 24, 2007, Brown treated with Dr. Ravi Lakkaraju, who diagnosed back pain and radiculopathy. (Tr. 510).

In March 2007 Brown discussed panic attacks with her primary care provider, Physician's Assistant Delinah Anderson, who prescribed anti-anxiety medication. (Tr. 811-12).

On April 25, 2007, Physician's Assistant Anderson noted right arm pain and started Brown on a course of Vicoprofen to treat arm pain. (Tr. 473). A study of Browns' right elbow

from that same date showed no acute factures or evidence of joint effusion. (Tr. 500). On May 24, 2007, Brown complained of elbow pain and was started on a course of Cymbalta to treat her depression. (Tr. 470).

On June 27, 2007, Dr. Mark Weber noted that Brown suffered from "some arthritis" of the elbow. (Tr. 505).

On July 16, 2007, Brown was treated for Hepatitis C. (Tr. 501-02).

On July 23, 2007, Brown treated at Au Sable Valley Community Mental Health. (Tr. 538). Social worker Beverly Pourcho rated Brown's GAF score on admission at 38, and 41 at the time of discharge. (Tr. 538). She presented well groomed, well dressed, cooperative, with normal speech, and appropriate affect. (Tr. 552). However, she was anxious, depressed, and irritable. (Tr. 552). She experienced no perceptual distortions, had adequate abstracting ability, was fully oriented to time place and person, had no impairment to her short term memory, and showed moderately impaired concentration. (Tr. 552-53). However, it appears that these findings were based entirely on Brown's own self-reporting, as each of the comment boxes begins with "Lori says" or "Lori states," rather than objective findings. (*Id.*).

Brown treated regularly with social worker Pourcho at Au Sable Valley Community Mental Health throughout 2007 and 2008; though the treatment sessions are generally collections of Brown's complaints with few objective observations. The relevant findings from these sessions will be discussed as they appear chronologically below.

On August 3, 2007, Brown reported that she was experiencing stress at a level of nine out of ten. (Tr. 566). On August 22, 2007, she reported having panic attacks daily, and was

"looking for a place to live." (Tr. 582). Brown was not sleeping well, felt moody and irritable, and thought she was experiencing manic episodes. (*Id*.).

On September 26, 2007, social worker Pourcho noted that Brown's affect was flat, her mood depressed, her stress level was at a six out of ten, but that she was having fewer panic attacks and was taking more walks and "enjoying nature again." (Tr. 580).

On October 16, 2007, Brown underwent an MRI examination which Dr. Stephen Brown interpreted to show normal vertebral body heights and alignment, mild degenerative disc disease changes, narrowing of the spinal canal, mild diffuse disc bulges at L4-5 and L5-S1, eccentric disc bulges laterally at L3-L4 on the left and L4-L5 on the right, and probable mild impingement on the exiting nerve roots. (Tr. 497).

On November 6, 2007, Brown informed Physician's Assistant Anderson of "severe pain in her low back with radiation down into her right lower extremity," along with stabbing and burning pain. (Tr. 892). Brown asserted that she had experienced the pain for many years, but that it had exacerbated recently, and that use of injections and therapy had not provided much relief. (*Id*.).

On November 26, 2007, Dr. S. Sriharan evaluated Brown's physical condition, finding that she was "quite tender to palpation of the lower lumbar spine diffusely across the lower back with restricted range of flexion and extension." (Tr. 523). Brown could walk on heel and toe with minimal difficulty, could straight leg raise with some back and hip pain, had no motor deficits, and suffered "some sensory loss" over the anterolateral right thigh. (*Id*.). On the same date, social worker Pourcho assigned a GAF score of 38, and found that Brown's stress level

was an eight out of ten, that she "still has lots of anxiety, mood swings, worries a lot," and that she was still experiencing panic attacks. (Tr. 1198).

Brown cancelled therapy sessions on October 1, October 10, and December 28, 2007. (Tr. 574, 578-79).

A December 4, 2007, bone scan interpreted by Dr. Brown showed no abnormal areas of accumulation of activity in the lumbar spine. (Tr. 598).

On January 8, 2008, Brown sought medication refills from Physician's Assistant Anderson, and noted that she had been experiencing "a lot of panic attacks" due to family induced stress, and that use of Xanax as an anti-anxiety medication "really does help her." (Tr. 888). An assessment was made of her degenerative disc disease, and she was provided with Vicodin to combat pain from that condition. (*Id*.).

On February 13, 2008, Dr. Larisa Bruma conducted several nerve studies, finding no abnormalities. (Tr. 519). On that same day, social worker Pourcho assessed a GAF score of 38, and noted that Brown "feels some things have improved, [and is] having less panic attacks, but [is] still having mood swings and stress level is still high." (Tr. 559). On April 28, 2008, Dr. S. Sriharan suggested physiotherapy and recommended against surgery. (Tr. 521). On that same date, Brown reported that she no longer wishes to see a psychiatrist, though no reason was given for that choice. (Tr. 558).

On February 25, 2008, Brown again cancelled a mental health treatment appointment without explanation. (Tr. 570).

On March 8, 2008, Physician's Assistant Anderson noted evidence of degenerative disc disease of the lumbar spine and degenerative arthritis of the right knee. (Tr. 460). Dr. Matthew

Waack found generally normal results except chondromalacia of the patella, subcutaneous edema of the anterior patellar tendon, "likely represent[ing] active inflammation," and a nonspecific bone marrow signal, "likely of no significance." (Tr. 498).

A February 7, 2008, study of Brown's right knee revealed no "gross acute facture or osseous abnormality." (Tr. 499). Brown was found to suffer from degenerative disc disease, right knee pain, and anxiety in January, February, March and April of 2008. (Tr. 463-66). On June 2 and September 25, 2008, Brown told Physician's Assistant Anderson of chronic low back pain, and noted that pain medication "did significantly help with her pain." (Tr. 454, 458).

On March 4, 2008, Brown complained to Physician's Assistant Anderson about knee pain, including the feeling that her knee was going to "give out," and was given a refill on her anti-anxiety medication. (Tr. 885).

On March 24, 2008, Dr. Todd Holtz performed a consultative examination of Brown's physical condition, in which he noted that Brown experienced significant low back pain, rating her recent back pain between a five out of ten and nine out of ten, without numbness or tingling. (Tr. 503). Her pain increased when maintaining any postural position for any length of time, and she found sleep difficult. (*Id.*).

On April 1, 2008, Brown treated with Dr. Dibella, who found "[d]egenerative changes in the lumbar spine with associated radiculopathy at L5-S1," and complained of "pain just below the knee cap and around the back [of the knee]." (Tr. 590). She was again prescribed anti-anxiety medication. (*Id.*).

On April 2, 2008, Brown was scheduled to undergo a caudal epidural steroid injection and facet joint injection, but failed to appear. (Tr. 534). On May 6, 2008, Brown was scheduled

10

to undergo a facet joint injection to treat her arthropathy and radiculopathy, but again skipped her appointment for unstated reasons. (Tr. 533).

On July 30, 2008, Brown asked Physician's Assistant Anderson for refills of her anti-anxiety medication. (Tr. 881).

On October 9, 2008, Brown underwent an MRI examination of her spine, which Dr. Sanjay Talati interpreted to show normal lumbar vertebral heights, "patchy marrow signal throughout the visualized lumbar vertebra, suggesting possible osteopenia," loss of disc signal at L3-L4 through L5-S1 secondary to degenerative disc desiccation, concentric annular tear of the posterior central aspect of the L5-S1 disc with mild bulging annulus, along with hypertrophy of the ligament causing central canal stenosis, and a mild disc bulge at L3-L4. (Tr. 495).

On February 9, 2009, Dr. Sriharan noted Brown's complaints of back and leg pain, and that Brown had undergone some but not all of the epidural shots she was scheduled to receive, and reported that those shots did not provide a substantial reduction in pain levels. (Tr. 936). Brown asserted that she had pain in both legs; she was found to have tenderness in the lower back, and restricted leg raise, but did not suffer from an obvious neurological deficit. (*Id*.). He suggested surgical repair of her spinal compression, but noted that it was the option of last resort. (*Id*.). Also on that date Brown requested increased strength Vicodin from Physician's Assistant Anderson because her back pain "has gotten much worse." (Tr. 977).

On May 4, 2009, Dr. Sriharan recorded that Brown complained of worsening symptoms and scheduled her for epidural shots. (Tr. 935).

11

On May 21 and July 16, 2009, Physician's Assistant Anderson prescribed additional anti-anxiety medication and pain medication to treat back pain. (Tr. 970-972).

On September 14, 2009, Dr. Sriharan interpreted an MRI of Brown's back, finding "degenerative disk at L5-S1 with the broad and central bulges" along with "a little bit of degeneration of the disks about L4-L5, but lesser at L3-L4. The degree of canal compromise is relatively moderate at the very most, mostly in the foramina . . . [in addition to] a foraminal tear on the right side at L4-L5." (Tr. 934). Dr. Sriharan also noted that the symptoms were mostly on the right side," and were mostly the result of "mechanical weakness of the disk levels;" he also discussed the risks and benefits of surgery to fuse her spine. (*Id.*).

Brown's insured status for DIB purposes expired on September 30, 2009. (Tr. 317). "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir.2004) (citation omitted). Such evidence is relevant only insofar as it demonstrates the claimant's disability during the insured period. *See Haynor v. Comm'r of Soc. Sec.*, No. 08-14941, 2009 WL 5184311, at *8 (E.D. Mich. Dec. 18, 2009). However, for sake of completeness the Court will thoroughly examine the medical evidence produced after Brown's date last insured.

Brown visited D.O. James Bash on November 4, 2009, complaining of coughing and shortness of breath; he prescribed antibiotics. (Tr. 965). On December 11, 2009, Nurse Practitioner David Hickman treated Brown for back pain. (Tr. 962). He noted pinpoint back pain in the midthoracic spine, which interfered with her ability to take deep breaths. (*Id.*). He prescribed antibiotics and took a blood sample. (*Id.*).

On November 9, 2009, Brown underwent a Doppler study of her lower extremity arteries, which Dr. R.P. Heuschele found to show normal results. (Tr. 988).

On November 11, 2009, Brown treated with D.O. Debra Peven, who interpreted nerve conduction study of Brown's arms to show "no electophysiological evidence for a bilateral upper extremity mononeuropathy, radiculopathy or brachial plexopathy." (Tr. 984).

On November 25, 2009, Dr. Waack interpreted an MRI study of Brown's hand to show findings "suggestive of erosive osteoarthritis," but with "[n]o acute findings." (Tr. 986).

On July 12, 2010, Dr. Jamal Akbar interpreted an MRI study of Brown's spine, finding "[s]table appearance of the degenerative changes of the lumbar spine with minimal degenerative spinal stenosis at L3-L4, L4-L5 and L5-S1 levels," "no compression fracture or large herniated nucleus pulposus," and "[m]inimal central focal or a tiny herniated nucleus pulposus at L5-S1 level remains stable." (Tr. 938).

On October 25, 2010, Physician's Assistant Anderson treated Brown for chronic back pain, which was so severe that she visited the emergency room the week prior and was diagnosed with a urinary tract infection. (Tr. 955). Anderson found that Brown was not suffering from a urinary infection, and found that she was most likely suffering from "a flare-up of her back pain." (*Id*.).

On October 28, 2010, D.O. Peven interpreted a nerve conduction study of Brown's ankles, finding "a mild decrease in bilateral peroneal, and right tibial motor amplitudes." (Tr. 982). The tests revealed otherwise normal results, showing "no electrophysiological evidence for bilateral lower extremity mononeuropathy . . . radiculopathy or peripheral neuropathy." (*Id*.).

13

On January 10, 2011, Dr. Sriharan performed a reevaluation of Brown's back pain. (Tr. 931). He noted that Brown's insurance had not covered injections or therapy, and that she experienced continuing back pain with radiation into the right hip and both legs. (*Id*.). This resulted in difficulty standing and walking, along with some numbness and a burning sensation. (*Id*.). He also reviewed an MRI scan of her back, finding "some degenerative disk at L5-S1 with a small bulge, a little bit of foraminal narrowing. . . [and] very mild degeneration of the other levels. (Tr. 932). She also showed restricted movement in terms of leg raises, but "otherwise showed good strength, sensation, and deep tendon reflexes." (*Id*.). He also discussed the risks and benefits of surgical decompression and fusion of the L5-S1 vertebrae, but noted that it was "not something that ha[d] to be done." (*Id*.).

On January 31, 2011, Physician's Assistant Anderson noted Brown's anxiety and chronic low back pain in the course of treating right ear pain. (Tr. 951).

On April 28, 2011, Physician's Assistant Anderson assessed chronic low back pain, including pain radiating down into her legs, along with numbness in the lower right extremity. (Tr. 946).

On July 25, 2011, Physician's Assistant Anderson assessed left lower extremity pain, degenerative disc disease of the lumbar spine, and refilled her anxiety medication. (Tr. 943).

On August 9, 2011, Brown underwent a venous duplex scan, which Dr. Talati interpreted as a "[n]ormal Doppler artery examination of the bilateral lower extremities," showing "[n]ormal ankle brachial indices," [n]o focal stenosis on either side," "[n]o aortoiliac inflow disease," "[n]o significant interval change compared to prior examination from 11/9/09." (Tr. 981).

14

On August 29, 2011, professional counselor Neddine Wuelping recorded that Brown experienced depression and panic, including irritable mood, mood swings, fatigue, sleeping issues, mild problems with concentration, and feelings of hopelessness. (Tr. 1240).

An October 19, 2011, study of Brown's spine interpreted by Dr. Peter Tomko revealed "no unusual findings." (Tr. 1076).

On November 21, 2011, Brown underwent a physical examination with Dr. A. Neil Johnson at Disability Consultants P.C. (Tr. 1001). Brown's chief complaints were of diabetes, bipolar disorder, arthritis, and hepatitis C. (*Id*.). She asserted that she "gets very loud and snaps," throws things, sometimes "does not know what she is doing," and even once attempted to run over her husband some ten years prior. (*Id*.). She also reported panic attacks, including when watching television. (*Id*.). She reported that her lumbar spine pain was at ten out of ten every day, along with pain in her elbow at nine out of ten, and knee pain at eight and five out of ten on the right and left knees respectively. (*Id*.). She reported being unable to walk up stairs due to pain and fear of falling, "would not squat," and "[was] not driving." (*Id*.). She reported that she could not lift a gallon of milk, could stand for five and sit for twenty minutes, and stated that walking one block "hurts like heck." (*Id*.). She was not able to vacuum, cut the lawn, or shovel snow. (*Id*.). On physical examination, Dr. Johnson noted that Brown walked with "antalgic small step gait and avoid[ed] weight at the right heel." (Tr. 1002). Brown "may" have had limited flexion of the lumbar spine, had moderate difficulty getting on and off the examination table, "severe" difficulty with heel and toe walking, and was unable to squat or hop. (*Id*.). She had only 30 degrees of flexion in her dorsolumbar spine, but otherwise normal flexibility and rotation ability in that area. (Tr. 1003). In his conclusions, Dr. Johnson noted

15

Brown's history of mental illness, including bipolar disorder and panic attacks; her diabetes; joint pain in the back, right elbow, knees, and right heel; loss of motion in the back, right elbow, hips, and knees; impaired heavy lifting ability; and somewhat impaired lifting with her right hand; and hepatitis C. (Tr. 1004).

On December 22, 2011, Brown visited Primary Care Rifle River complaining of acute back pain. (Tr. 1041). She reported experiencing excruciating, sudden pain after sitting on the couch to watch television, and felt unable to walk. (*Id*.). She dragged her right foot, and reported that a pain relieving injection administered at the hospital the day prior only "took the edge off" her pain, and that her Vicodin was not "even touching this [pain]." (*Id*.). Brown cried when reporting her symptoms, and the unknown writer recorded that "any motion at all hurt[] her." (*Id*.). The unknown writer diagnosed a probable "herniated disk on the central spinal canal," prescribed pain medication, and said that she would be "set up for an MRI ASAP." (*Id*.).

On December 23, 2011, Dr. Gadam Ramakirishnayya interpreted an MRI of Brown's spine, finding no "dominant disk herniation," but finding a "peripheral anular [sic] tear at L5-S1 with slight bulge of the annulus, without "thecal sac stenosis," and with "[e]arly degenerative disk disease at L3-L4." (Tr. 1071).

On January 9, 2012, Brown visited Physician's Assistant Anderson again for a "recheck for acute back pain." (Tr. 1039). No specific findings were made regarding her back pain or anxiety, but both were noted in the assessment, and additional Xanax and Vicodin prescriptions were given. (*Id*.).

16

Sparse notes indicate that Brown attended mental health therapy at Au Sable Valley Community Health from approximately August 2011 through August 2012. (Tr. 1258-76). Brown appears to have missed a significant portion, possibly a majority, of these sessions, usually without explanation or notification. (*Id.*). Those notes which contain substantial findings show that she sought help dealing with depression and anxiety. On December 19, 2011, Brown reported having "nightly panic attacks" without any understanding of what triggered them. (Tr. 1269). In January 2012 she complained of "getting angry at the littlest things." (Tr. 1267). By March 2012 she was "learning to deal with [her panic attacks] better." (Tr. 1265). In April 2012 she was "doing better with her depression and anxiety," and had "no real complaints;" however she also stated that she usually feels better when coming in for therapy and thus was not seen at her worst, and that she suffered from racing thoughts, and would like to see a psychiatrist. (Tr. 1263). In May 2012 she had "no real concerns," and "shared that things have been pretty decent for her." (Tr. 1262).

On May 31, 2012, Brown visited Dr. Lakkaraju for an evaluation of her fibromyalgia and chronic lower back pain. (Tr. 1283-84). In recording the history of Brown's illness, Dr. Lakkaraju noted that surgery was not recommended, epidural steroid injections were not helpful, and that Brown suffered from "diffuse disc degeneration L2-L3 L3-L4 L4-5" with "slight loss of disc height," normal L5-S1 disc space, "no significant stenosis," and mild bulging at L4-5 with possible annular tear. (*Id.*). She further noted that physical therapy seemed to exacerbate Brown's pain, and that Brown complained of "widespread tenderness" even to light touch, along with loss of endurance and increased fatigue. (*Id.*). Brown also had "difficulty doing sustained functional tasks around the house," and could not tolerate Lryica,

Cymbalta, or morphine. (*Id.*). Brown rated her pain level at six to seven out of ten despite use of the pain reliever Lortab five times daily. (*Id.*). However, Dr. Lakkaraju also noted that Brown experienced "excellent benefit" from the use of the pain reliever Dilaudid three times daily, and was using Vicodin "only once a day." (*Id.*). Further, Brown "report[ed] excellent control of her chronic pain with the above medication regimen." (*Id.*). Dr. Lakkaraju concluded that Brown suffered from fibromyalgia, which produced pain that Brown described as "chronic and constant," neck pain, and back pain. (*Id.*). These results were duplicated in June 28 and September 27, 2012, visits with Dr. Lakkaraju. (Tr. 1277, 1280-82).

Brown also submitted records dating from June 2009 to August 2013, produced by physicians at the West Branch Regional Medical Center and Dr. Lakkaraju, among others. (Tr. 1296-1461). However, these records were submitted following the ALJ's decision, and Brown has not moved for remand pursuant to "sentence six" under 42 U.S.C. § 405(g) to consider new and material evidence. That provision allows the district court to remand in light of additional evidence without making any substantive ruling as to the merits of the Commissioner's decision, but only if a claimant can show good cause for failing to present the evidence earlier. *See Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991). The Sixth Circuit has long recognized that a court may only remand disability benefits cases when a claimant carries his burden to show that "the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Brown has waived the "sentence six" remand argument by not addressing it in her motion. *See, e.g.*, *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (holding that "arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory

18

manner, are waived"); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner). The Court will thus not consider these records.

### 2.    Application Reports and Administrative Hearing

#### a.    Brown's Function Report

Brown completed a function report on September 6, 2011. (Tr. 348-55). In that report, she asserted that she is unable to work because she cannot lift, stand, push, pull, or sit. (Tr. 348). She asserted that pain in her back and legs keep her awake at night. (Tr. 349). Regarding personal care, she asserted that she is limited only in terms of dressing herself and caring for her hair, because those activities cause arm pain. (*Id.*). She does not require special reminders to take care of her personal needs. (Tr. 350). She reported preparing meals weekly, including frozen dinners and sandwiches, and asserted that preparing food takes thirty to sixty minutes because she is unable to stand for extended periods of time. (*Id.*). Regarding chores around the house, Brown asserted that she "do[es] not] do much" because her son performs chores for her. (*Id.*). She claimed that she goes outside two to three times per week, is unable to go out alone, and rides in cars rather than driving. (Tr. 351). She claimed that she shops for food monthly for two to three hours at a time, but must rest or stop while shopping. (*Id.*). She asserted no limitations in terms of paying bills, handling money, or managing bank accounts. (*Id.*). In terms of hobbies, she claimed that she watches television and movies, and plays board games. (Tr. 352). She visits with others monthly for birthdays and holiday celebrations. (*Id.*). In terms of her postural limitations, Brown claimed that she can walk, sit, or stand for five minutes, and

is unable to squat, bend fully, reach, kneel, or climb stairs. (Tr. 353). Brown claimed that she can lift only two pounds, walk only ten feet before stopping to rest, and must rest for ten to fifteen minutes. (*Id*.). She can pay attention for an hour, finishes what she starts, follows written instruction well, and follows spoken instructions in a "good to fair" manner. (*Id*.). She handles changes in routine "okay," but reported becoming upset frequently. (Tr. 354). She also reported using a cane while walking. (*Id*.).

Also on September 6, 2011, Brown's husband Ralph Brown completed a third-party function report in which he generally confirmed Brown's assertions. (Tr. 340-47).

### b.    Brown's Testimony at the Administrative Hearing

At the October 30, 2012, hearing before the ALJ, Brown testified to difficulty obtaining her medical records, and the hearing was adjourned. (Tr. 245). The ALJ counseled Brown on the wisdom of obtaining legal counsel. (Tr. 247).

At the August 5, 2013 hearing, the ALJ again asked Brown if she wished to obtain an attorney, and offered to again adjourn the hearing until such time as she could obtain counsel; Brown testified that she wished to proceed without counsel. (Tr. 201-02). The transcript reflects, in parentheticals, that the ALJ duly swore in medical expert Robert McDevitt ("McDevitt"), though the specific phrase used to swear him in was omitted. (*Id*.). The ALJ asked McDevitt to produce a "concise analysis from [his] expertise area; McDevitt discussed Brown's medical records and determined that she did not "meet[] the full diagnostic criteria for bipolar disorder," and that she could perform "simple, repetitive work." (Tr. 202-06). McDevitt also found that Browns' activities of daily living and social activities were mildly limited, and that her concentration persistence and pace was moderately limited. (Tr. 208). He also found

that she could perform sedentary work "and maybe could keep . . . up with . . . a reasonable amount of pace work." (*Id.*). The ALJ asked Brown whether she had any questions for McDevitt; she did not. (Tr. 205, 208).

The ALJ then asked Brown what limitations prevented her from working; she asserted that she was unable to work because of back pain, including arthritis, bulging discs, and sciatic nerve irritation. (Tr. 211). Brown stated that she experiences severe pain while standing or sitting "for any amount of time," and repeatedly noted that her pain was "killing" her. (*Id.*). She asserted that she could stand for ten to fifteen minutes and walk for ten minutes; she further asserted that she frequently changes positions and walks around in an attempt to relieve her pain. (Tr. 212). The ALJ then examined Brown's medical files, noting important findings and developing the record. (Tr. 213-21).

### c.      The VE's Testimony at the Administrative Hearing

The VE then testified, characterizing Brown's past relevant work as light and unskilled. (Tr. 221-22). Making use of Brown's consultative examination with Dr. Johnson, the VE found that Brown would be unable to complete any of her past work. (Tr. 223). The ALJ then apparently adopted the RFC assessments of Dr. Johnson and McDevitt, finding that Brown would be able to perform light work, but with only occasional use of the right hand, and could perform "simple, repetitive tasks, with the concentration, persistence, and pace being moderate limitation, able to keep up with production but requiring some effort on her part." (Tr. 223). The VE found that Brown would be able to perform the light, unskilled work of information clerk, of which there are about 200,000 jobs in the country, or non-production inspector, of which there are about 50,000 jobs nationally. (Tr. 223-24). The VE also noted that the

21

information clerk position was "not a production type of job" and thus could be performed with Brown's limitations. (Tr. 223). The ALJ then asked whether Brown had any questions for the VE, and she confirmed that she did not. (Tr. 224). Finally, the ALJ noted that the "[r]ecords are admitted and the record is closed;" a parenthetical notes that "Exhibits 1 through 21F, previously identified, were received into evidence and made a part of the record." (*Id*.).

## F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

22

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also*

23

*Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence

24

verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at

*2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ

ascertains the extent of the work-related limitations by determining the intensity, persistence,

and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health

& Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's

description of his physical or mental impairments alone is "not enough to establish the

existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ

may not disregard the claimant's subjective complaints about the severity and persistence of

the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL

374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to

consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication .
       . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40

(6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history

and the consistency of his or her subjective statements are also relevant. 20 C.F.R. §

404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Brown argues that the ALJ erred in the following ways: 1) failing to give Brown the opportunity to object to the credentials of the medical expert and VE; 2) failing to explain the roles of the medical expert and VE at the hearing; 3) failing to properly admit the medical exhibits; 4) failing to properly consider her fibromyalgia diagnosis; 5) failing to ask the VE whether his testimony conformed with the information in the Dictionary of Occupational Titles ("DOT"); 6) assessing an insufficiently restrictive RFC assessment given Brown's mental impairments. (Doc. 14 at 6-13).

#### 1.    *The ALJ's Failure to Notify Brown of Her Right to Question the VE and Medical Experts' Credentials was Harmless*

First, Brown argues that the ALJ erred by failing to "give Ms. Brown any opportunity to discuss or question the credentials of the medical expert *who appeared by phone*," and that she was "never afforded the opportunity to cross-examine the credentials of both the medical expert and vocational expert." (Doc. 14 at 6-7). Brown is correct that the transcript of her second hearing before the ALJ appears to show that she was not given an opportunity to

challenge the credentials of either the VE or McDevitt before those experts were permitted to testify. However, this is not grounds for remand. According to the Hearings, Appeals, and Litigation Law Manual ("HALLEX"), ALJs are required to "ensure that the record contains an accurate statement of the VE's professional qualifications" and to "give the claimant and the representative an opportunity to ask the VE questions about his or her professional qualifications." HALLEX I-2-5-55. THE VOCATIONAL EXPERT'S TESTIMONY, 1994 WL 637383, at *1. However, the Sixth Circuit has found that HALLEX is "not binding on this court," and thus establishes only guidelines for the Commissioner's behavior. *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008). An ALJ's failure to explicitly state that a VE is qualified does not mandate remand where "there is no evidence that the VE was unqualified or that his testimony was inconsistent or inadequate." *Bondy v. Comm'r of Soc. Sec.*, No. 13-CV-14537, 2015 WL 1530435, at *4 (E.D. Mich. Mar. 31, 2015).

Here, Brown does not even suggest that either the VE or McDevitt were unqualified, but rather merely suggests that remand is appropriate because the ALJ did not follow the relevant HALLEX requirements. In her reply brief, Brown argues that "without the opportunity to question the credentials in the first place, how can Plaintiff possibly [demonstrate how cross-examination of the expert would have invalidated his testimony]?" (Doc. 16 at 2-3). Brown could have accomplished this task either by demonstrating that the testimony of the VE or McDevitt was inaccurate, or by researching whether either expert had previously testified in similar hearings. As it happens, McDevitt has testified in numerous prior cases wherein his credentials were not disputed. *See, e.g., Williams v. Comm'r of Soc. Sec. Admin.*, 494 F. App'x 766, 768 (9th Cir. 2012) (referring to the testimony of medical expert Robert McDevitt);

27

*Longmore v. Astrue*, 783 F. Supp. 2d 1130, 1136 (D. Or. 2011) (same); *Cornish v. Astrue*, No. C07-5364FDB-KLS, 2008 WL 2519473, at *7 (W.D. Wash. June 20, 2008) (referencing the testimony of medical expert Robert John McDevitt). Similarly, VE Pauline McEachin is a well-known expert in Social Security cases in this district, and has testified in numerous cases. *See, e.g.*, *White v. Colvin*, No. 14-CV-12870, 2015 WL 5210243, at *5 (E.D. Mich. Sept. 3, 2015); *Lafayette v. Comm'r of Soc. Sec.*, No. 14-CV-10004, 2015 WL 847440, at *5 (E.D. Mich. Feb. 26, 2015); *Sadler v. Comm'r of Soc. Sec.*, No. CIV.A. 13-13552, 2014 WL 4724767, at *1 (E.D. Mich. Sept. 23, 2014). Thus, to whatever extent the ALJ erred by neglecting to explicitly state that the VE and McDevitt were qualified, this error was harmless. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010) (discussing harmless error, and noting that such a finding may be appropriate where the ALJ has "accomplish[ed] the goals of [a given] procedural requirement."); *Henson v. Astrue*, No. CIV.A. 10-707-GPM, 2011 WL 2649965, at *9 (S.D. Ill. June 15, 2011) (finding that an ALJ did not err by giving weight to a state agency physician whose qualifications did not appear in the record, because doing so would "ignore[] the recognized role of the state agency physician."). *But see Patterson v. Astrue*, No. CIV. 08-2725 RBK, 2011 WL 3652591, at *9 (D.N.J. Aug. 19, 2011) (remanding for lack of substantial evidence where an ALJ gave weight to the opinion of an "unknown" consultative physician whose qualifications and name did not appear in the record).

As to Brown's contention that the ALJ "did not ask [her] whether she wanted to cross-examine the VE," this is simply not supported by the record. (Doc 14 at 6-8). On page twenty-five of the transcript of the second hearing, the ALJ asked Brown if she "would . . . like to ask

28

any further questions of [the VE]." (Tr. 224). Brown asked a question regarding the location of the jobs the VE listed, given her difficulty obtaining transportation, and the ALJ clarified that the VE was testifying to the number of jobs nationally. (*Id.*). Brown then confirmed "I understand, I understand. But no, I don't have any questions." (*Id.*). Moreover, it seems that Brown admits her error in mischaracterizing the record in her reply brief. (Doc. 16 at 3).

## 2.    The ALJ Did Not Err by Neglecting to Explain the Roles of the VE and Medical Expert

Brown next presents a one-line argument, merely noting that "[t]he ALJ did not discuss the role of the medical expert or the vocational expert's role in a hearing." (Doc. 14 at 7). The Sixth Circuit has clearly held that "arguments adverted to in only a perfunctory manner, are waived." *Kuhn*, 709 F.3d at 624. Given that Brown presents this argument in a single sentence, without explanation or citation to authority, I find that she has waived the argument. *Trischler v. Comm'r of Soc. Sec.*, No. 14-12867, 2015 WL 5016600, at *25 (E.D. Mich. Aug. 24, 2015) (finding that a claimant's single-sentence argument was perfunctory and thus waived). Brown attempts to save this argument in her reply brief by supporting it with a reference to HALLEX. (Doc. 16 at 3). Specifically, she notes that HALLEX requires that the ALJ "advise the claimant of the reason of the VE's presence and explain the procedures to be followed." HALLEX I-2-6-74. TESTIMONY OF A VOCATIONAL EXPERT. This more developed argument is also barred, because it is raised for the first time in Brown's reply brief. *See McPherson v. Woods*, 506 F. App'x 379, 387 (6th Cir. 2012) (holding that an issue referenced perfunctorily in an opening brief and "exclusively developed" in a reply brief is still subject to waiver). Even if the Court was to consider this argument, it would fail; as noted above, HALLEX is merely

advisory, and is not binding. *See Bowie*, 539 F.3d at 399. Thus, even if Brown had not waived this argument, it would not present grounds for remand.

### 3.    The ALJ Did Not Fail to Admit the Medical Exhibits

Brown also argues that the ALJ erred by failing to "even move to admit the [medical] exhibits. This is clear procedural and reversible error." (Doc. 14 at 6). Brown cites HALLEX I-2-6-58 for this proposition, apparently referring to the portion of that regulation which states that the ALJ "will admit into the record any evidence he or she determines is material to the issues in the case." (*Id.*). Like Brown's prior claim of error, this argument is simply not supported by the transcript, which clearly shows that the ALJ did move to admit those exhibits into evidence. The ALJ specifically noted that "[r]ecords are admitted and the record is closed," and the transcriptionist reflected that Exhibits 1 through 21F were admitted to the record. (Tr. 224).

Perhaps in recognition of this mischaracterization, Brown uses her reply brief to morph her argument into another form. In her reply brief, she argues for the first time that "the ALJ did not comply with HALLEX by *asking* if Ms. Brown had an opportunity to review the exhibits and whether she had any objections to the same." (Doc. 16 at 1). Arguments raised for the first time in a reply brief are waived, thus this argument is also waived. *See Kuhn*, 709 F.3d at 624. Yet even if the Court was to consider this argument, it would nevertheless find that failure to comply with HALLEX is not grounds for remand, because HALELX is not binding authority. *See Bowie*, 539 F.3d at 399.

### 4.    The ALJ Did Not Err in His Consideration of Brown's Fibromyalgia

Brown also argues that the ALJ erred by failing to include a discussion of Brown's diagnosed fibromyalgia at both Step Two and Step Five of the sequential evaluation process. (Doc. 14 at 8-9). In other words, the ALJ did not list fibromyalgia as a severe impairment, and did not mention that malady in his discussion of her RFC assessment. (Tr. 188-91). Brown notes that Dr. Lakkaraju diagnosed fibromyalgia; found that Brown experienced "tender points too numerous to mention;" noted her "widespread tenderness in major muscle groups in her arms and legs," including to light touch; and that she suffered decreased endurance. (Doc. 14 at 8-9).

Regarding the ALJ's alleged error in failing to cite fibromyalgia as a severe impairment, this does not require remand. Where an ALJ finds that a claimant experiences at least one severe impairment, failure to list other impairments as severe is "legally irrelevant," because the ALJ is then obligated to consider all severe and non-severe impairments in the remaining steps of the sequential analysis. *See Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

Brown is correct that the word "fibromyalgia" does not appear in the ALJ's decision. The ALJ merely notes that "[i]n September 2012, the claimant's pain management physician, Dr. Lakkaraju, also reported that surgery was not recommended after a surgery consult," and, possibly referencing Dr. Lakkaraju's findings, that "the remainder of the claimant's report is unremarkable." (Tr. 190-91). However, an ALJ need not cite every piece of medical evidence in order to render a decision supported by substantial evidence, but rather must merely consider all of the submitted evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006). Here, the ALJ rendered his decision in light of "all symptoms and the extent to which th[ose] symptoms can be reasonably accepted as consistent with the objective

31

medical evidence and other evidence." (Tr. 189). The question then is whether the ALJ inaccurately downplayed the findings of Dr. Lakkaraju in a manner that led a finding of non-disability which was not supported by substantial evidence. If the ALJ's findings are not supported by "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," then remand is required. *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 750 (6th Cir. 2011) (quotation omitted). Further, where an ALJ mischaracterizes the totality of the record, remand may be appropriate. *See Roberts v. Colvin*, No. 13-14675, 2015 WL 181658, at *10 (E.D. Mich. Jan. 14, 2015).

Brown's medical records indicate that she visited Dr. Lakkaraju in May, June, and September of 2012. (Tr. 1277-86). The parties seem to agree that Brown also visited Dr. Lakkaraju on October 19, 2011, but this is not supported by the records. (Doc. 14 at 9; Doc. 15 at 11). On the contrary, Brown appears to have visited with Physician's Assistant Anderson on that date, and that record was merely forwarded to Dr. Lakkaraju. (Tr. 1286-91). Indeed, the records indicate that Brown's May 31, 2012, visit with Dr. Lakkaraju was her initial consultation with that physician. (Tr. 1283). On that date, Brown complained of "widespread pain, fatigue, poor endurance, sleep disturbance and superimposed chronic lower back pain." (*Id.*). She was seen for a "fibromyalgia evaluation," apparently having been diagnosed with that disorder on April 12, 2012. (Tr. 1283, 1286). Dr. Lakkaraju further noted that Brown had previously tried physical therapy and epidural injections to little effect, and that surgical intervention had not been recommended by Dr. Sriharan. (Tr. 1283). Brown complained of widespread tenderness, including to light touch, and becoming easily fatigued while performing sustained household activities. (*Id.*). Brown rated her pain at six to seven out of ten.

32

(*Id.*). Brown described widespread, chronic, constant pain which Dr. Lakkaraju found consistent with myalgia. (*Id.*). Dr. Lakkaraju found that Brown's retained full strength in her upper and lower extremities, had normal gait, no unsteadiness, did not use an assistive device to walk, and normal reflexes, but suffered from tenderness across numerous regions of her body. (Tr. 1284). Dr. Lakkaraju also noted increased lumbar lordosis, paresthesia, radicular pain, and weakness. (*Id.*). Brown was prescribed with OxyContin, her exercise was "limited to Evaluation of physical activities," and was advised to adopt a healthier diet. (*Id.*).

Brown's June 28, 2012, session with Dr. Lakkaraju produced largely duplicated findings, but it was noted that Brown's insurance would not cover OxyContin. (Tr. 1281-82).

Brown's September 27, 2012, visit with Dr. Lakkaraju again produced largely similar findings, except that Brown "report[ed] excellent benefit with [the pain reliever] Dilaudid. . . . She is averaging Vicodin only once a day. She reports excellent control of her chronic pain with the above medication regimen." (Tr. 1277). She again was found to have normal gait, full upper and lower extremity strength. (Tr. 1278).

While the ALJ's treatment of Dr. Lakkaraju's findings can hardly be considered a model of completeness or clarity, the Court cannot find that he misrepresented or ignored the medical records in a manner which mandates remand. Dr. Lakkaraju's findings largely duplicate those findings of other physicians, namely that Brown suffered from widespread tenderness, back pain, and fatigue. The ALJ noted Brown's own complaints of pain when walking, attempting to exercise, and lift objects. (Tr. 190). Further, he made note of her December 2012 lumbar MRI report showing a slight bulge without protrusion, negative EMG studies, elbow surgery, loss of motion with pain in the right elbow, limited range of motion in

33

the lumbar spine, degenerative arthritis, limited ability to lift heavy objects. (Tr. 190-91). While the ALJ did not specifically mention Brown's fibromyalgia diagnosis, there is no evidence in the record that her resulting symptoms were disabling. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) ("Disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it."). Furthermore, a more extensive discussion of Dr. Lakkaraju's findings would have also called attention to her determination that Brown had full strength in the upper and lower extremities, walked with normal gait, without instability or the use of a cane, and that Brown had achieved "excellent control of her chronic pain" through the use of Dilaudid, contrary to her assertions of disability. (Tr. 1277-78). Nothing in the record indicates that Brown's limitations require greater restrictions than those implemented by the ALJ, namely a limitation to light work and occasional use of the right arm. (Tr. 189). The ALJ's somewhat cursory treatment of Dr. Lakkaraju's findings is thus not a sufficient reason to remand this case.

**5.    The ALJ's Errors in Questioning the VE are Harmless**

Brown also argues that the ALJ erred by failing to ask the VE whether her testimony comported with the Dictionary of Occupational Titles ("DOT"). (Doc. 14 at 9-10). Brown notes that the VE did not provide DOT numbers to specifically identify the positions of "information clerk" and "inspector," but rather provided only those non-specific titles, which can refer to "over 250 inspectors . . . and 5 information clerks." (*Id*. at 10). Further, she notes that the ALJ "never asked the VE whether the jobs listed . . . conflicted with the information contained in the DOT." (*Id*.).

Brown is correct that the ALJ did not ask the VE to give specific DOT codes for the jobs she identified. However, "failure to specify DOT codes for the positions identified is not fatal to the ALJ's decision" where "[t]he ALJ was thorough in determining a residual functional capacity for plaintiff, and applied that capacity in his discussion with the vocational expert." *Espey v. Comm'r of Soc. Sec.,* No. CIV. 13-14859, 2015 WL 1197808, at *10 (E.D. Mich. Mar. 16, 2015); *see also Wilson v. Comm'r of Soc. Sec.*, No. 10-13828, 2011 WL 2607098, at *6 (E.D. Mich. July 1, 2011) ("[T]he Social Security regulations do not require the VE to rely on classifications in the DOT.").

Brown is also correct that the ALJ failed to ask the VE whether there were any inconsistencies between her statements and the DOT, but instead stated in his decision "I have determined that the vocational expert's testimony is consistent with the information contained in the [DOT]." (Tr. 192). *See Goulette v. Comm'r of Soc. Sec.*, No. 12-11353, 2013 WL 2371695, at *11 (E.D. Mich. May 30, 2013) (noting the ALJ's obligation to identify and explain any conflicts between the occupational evidence provided by the VE and information in the DOT, pursuant to Social Security Ruling 00-4p). However, where no apparent conflict exists between the VE's findings and the DOT, a substantial body of law holds that remand is not necessary. *Id.* (noting that "courts in this circuit have generally concluded that the ALJ's failure to inquire about consistency with the DOT is not reversible error unless a potential conflict actually exists," and compiling cases). Brown points to no apparent conflict between the DOT and the VE's testimony, thus remand would be inappropriate for this harmless error.

### 6.   The ALJ Did Not Err by Crafting an Insufficiently Restrictive RFC With Regard to Brown's Mental Limitations

35

Finally, Brown argues that the ALJ erred by crafting an inadequately restrictive RFC assessment as the result of improperly assessing her mental impairments. (Doc. 14 at 11-13). She notes that her "emotional problems are significant enough to require an Assertive Community Treatment Team to treat her major Depressive Disorder and Panic Disorder," and points to her complaints of panic attacks, sleep issues, and tendency to isolate herself because of depression. (*Id*. at 11-12). Further, Brown argues that the ALJ has conflated "*work skills* with *mental abilities*" by including in the RFC a limitation to simple, unskilled repetitive work with the ability to keep up with production demands. (*Id*. at 12).

Brown's assertion that her depression and panic disorders are severe because she requires a "treatment team" to combat her ailments is difficult to understand. There is no indication in the record that Brown was hospitalized or given any other form of intensive treatment for her mental illnesses, but rather was simply seen as a routine outpatient at Au Sable Valley Community Mental Health. This is somewhat like arguing that a claimant who has a broken arm treated at a hospital should be considered more injured than one who was treated by a single physician, because the hospital-going person "required an entire hospital team to treat his injury." Moreover, Brown seems to have treated with social worker Pourcho or professional counselor Wuelping on most occasions, thus to say that she was treated by a "team" is somewhat disingenuous.

Moreover, Brown's mental health records simply do not indicate that a more restrictive RFC was appropriate. To be certain, Brown often reported experiencing panic attacks and symptoms of depression. (*See*, *e.g.*, Tr. 519, 580, 888, 1198, 1240, 1269). Yet she also reported walking more and enjoying nature in 2007 (Tr. 580), experiencing substantial relief from the

36

use of Xanax in early 2008 (Tr. 888), and was experiencing improved mood and fewer panic attacks in 2008 (Tr. 559). Furthermore, the records after her date last insured also show that her mental health continued to improve. By March 2012 Brown was "learning to deal with [her panic attacks] better" (Tr. 1265), and in April 2012 she was "doing better with her depression and anxiety," and had "no real complaints." (Tr. 1263). In May 2012 Brown had "no real concerns," and "shared that things have been pretty decent for her." (Tr. 1262). As the ALJ noted, the prescriptions Brown takes to treat her mental ailments remained largely unchanged for several years, contrary to what one would expect from someone who was struggling with disabling depression. (Tr. 190). Further, the ALJ noted that Brown socializes with friends, can prepare meals, can handle money, go out alone, and shop for groceries. (Tr. 188). While the ALJ did not reference Brown's self-reported hobbies, her ability to watch television and movies and to play board games also suggests intact concentration and thinking abilities sufficient to complete those tasks. (Tr. 352). The ALJ questions Brown's credibility; while he does not point out specific inconsistencies in her testimony, there is good reason to think that her self-reported limitations are somewhat exaggerated. (Tr. 190). For instance, Brown reported no difficulty walking in 2006 (Tr. 443), was taking nature walks in 2007 (Tr. 580), reported being unable to walk one block and with a small step gait, avoiding her right heel during a 2011 disability consultation (Tr. 1002), reported that she could only walk ten *feet* and required the use of a cane in her September 2011 function report (Tr. 353-54), and stated that she could walk for ten to fifteen minutes at the August 2013 hearing before the ALJ. (Tr. 212). Brown also wrote in her function report that she could lift only two pounds (Tr. 353), said in 2006 that she could lift only two pounds (Tr. 440), and said she could not lift a gallon of milk

in 2011 (Tr. 1001). However, Dr. Lakkaraju found in May 2012 that Brown walked with normal gait, no unsteadiness, and did not use a cane or other assistive device to walk, and that she retained full strength in all extremities. (Tr. 1277-78).

Brown's argument that the ALJ conflated "work skills" with "mental abilities" also fails. Specifically, she asserts that "work skills refer to the amount of time [in which] a job can be learned and how much judgment a job requires . . . [whereas] mental abilities include factors such as understanding, remembering and carrying out instructions." (Doc. 14 at 12). Brown appears to be referencing the conclusion drawn by the court in *Eisler v. Barnhart*, 344 F. Supp. 2d 1019, 1029 (E.D. Mich. 2004), which found that limiting a claimant with moderate concentration, persistence, and pace issues to "unskilled" work conflates "work skills" with "mental abilities," because "unskilled" deals with the amount of experience necessary to complete a job rather than the innate mental abilities necessary to perform the work. Yet that analysis is inapt here, where the ALJ not only limited Brown to "unskilled" work, but also to "simple, repetitive work," and noted that she can "keep up with the demands of production." (Tr. 189). These latter criteria do not relate to the experience necessary to perform the work, but rather to the mental capacity which the worker must possess to complete said work. Thus, Brown, rather than the ALJ, appears to have conflated work skills with mental abilities in this case.

Brown also asserts that her "moderate" limitation to concentration, persistence, or pace required greater limitations in the RFC than what the ALJ applied. (Doc. 14 at 12). She cites *Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009), in which a "moderate" limitation to concentration, persistence, or pace was found to necessitate some sort

38

of limitation in terms of the frequency or consistency of the ability to concentrate, and *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005), in which a "moderate" limitation to concentration, persistence, or pace was found to require more than a limitation to "jobs entailing no more than simple, routine, unskilled work."

The question of whether restrictions similar to these can accommodate a finding of moderate limitations to concentration, persistence, or pace have been addressed frequently in this district. Restating the history of those cases once again would be unnecessarily duplicative. See *Leidlein v. Comm'r of Soc. Sec.*, No. 14-10718, 2015 WL 1439810, at *9 (E.D. Mich. Mar. 27, 2015) (collecting cases); *Brewer v. Comm'r of Soc. Sec.*, No. CIV.A. 10-14039, 2011 WL 7546792, at *12 (E.D. Mich. Dec. 11, 2011) (same); *McNamara v. Comm'r of Soc. Sec.*, No. CIV.A. 11-10331, 2011 WL 7025855, at *12 (E.D. Mich. Dec. 1, 2011) (same). Suffice it to say that "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must "look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Taylor v. Comm'r of Soc. Sec.*, 2011 WL 2682682 at * 7 (E.D. Mich. May 17, 2011). Courts have found no error where there is an "inconsistent record of difficulties with concentration, persistence or pace" and where there is a "dearth of evidence . . . that Plaintiff's 'moderate' CPP rating would preclude her from performing all simple work." *Brewer v. Comm'r of Soc. Sec.*, No. CIV.A. 10-14039, 2011 WL 7546792, at *12 (E.D. Mich. Dec. 11, 2011); *see also Mortzfield v. Comm'r of Soc. Sec.*, No. 12-15270, 2014 WL 1304991, at *10 (E.D. Mich. Mar. 31, 2014). In this case, the ALJ restricted Brown to "unskilled, simple, repetitive work," and noted that she can "keep up with the demands of production." (Tr. 189).

Notably, and in contradistinction to the set of cases just cited, the ALJ in this case did not leave open the question of Brown's capacity for production at pace, but rather explicitly found that she is capable of performing at speed without issues resulting from her limitations to concentration, persistence, or pace. (*Id*.). The ALJ made this finding pursuant to the testimony of McDevitt at the second hearing. (Tr. 188). Specifically, the ALJ asked McDevitt what he meant by the word "moderate" in terms of Brown's concentration, persistence, or pace impairment, and he responded that based on "the effort she put out, she's able to do things. I think . . . she's remarkably functional on th[e] amount of medication [she takes], so I think she could probably at least do sedentary work, and maybe could keep . . . up with production . . . [or] do a reasonable amount of pace work." (Tr. 208). The RFC drafted by the ALJ was consistent with this finding, thus the ALJ did not err.

As always, the claimant bears "the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 674 (6th Cir. 2009) (quotation omitted). Brown points to evidence of her panic attacks, sleep issues, and isolation resulting from depression to demonstrate that she is incapable of performing unskilled work at pace. (Doc. 14 at 12). However, as noted above, the medical evidence reflects that her depression and anxiety were fairly well controlled, as demonstrated both by her reported symptoms and the consistency of her medication regimen, and further show generally consistent improvement of her symptoms over the course of her treatment. Further, the other concentration, persistence, or pace assessment in the medical records results from a treatment session with professional counsellor Wuelping at Au Sable Valley Community Health, drafted on August 29, 2011, wherein Wuelping found that Brown

experienced only "mild" limitations to concentration, persistence, or pace. (Tr. 1240). Having reviewed the totality of the medical evidence, the ALJ's assessment is correct in that Brown's asserted limitations in the areas of concentration, persistence, or pace are simply not consistent with the relatively mild findings made over the course of her mental health treatment, are similarly inconsistent with her fairly high level of functioning in her activities of daily living, and thus do not justify greater restrictions than those provided in the ALJ's RFC. (Tr. 188-89). The ALJ's decision is thus supported by substantial evidence.

### H.   Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Brown's Motion for Summary Judgment (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 15) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390,

401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 20, 2015                    S/PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 20, 2015                    By s/Durene Worth
                                          Acting in the absence of Kristen Krawczyk
                                          Case Manager to Magistrate Judge Morris